IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02454-MEH

DOROTHY BARRETT-TAYLOR,

      Plaintiff,

v.

BIRCH CARE COMMUNITY, LLC,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court is Defendant's Motion for Summary Judgment. ECF 60. The Motion is fully briefed, and the Court finds that oral argument will not materially assist in its adjudication. For the reasons that follow, the Motion is granted.

## BACKGROUND

### I.    Material Undisputed Facts

      1.    Plaintiff's nephew resided at the University Heights care facility that Genesis Health Care, Inc. ("Genesis") operated. In 2016, Plaintiff applied for employment there so that she could "keep an eye on him" and ensure "that he was receiving the appropriate level of care." ECF 60-1 at 6. Genesis did not hire her for a business management position "even though [she] was overqualified, more qualified [than] the person who did get the position." *Id*. at 6–7, 8. Genesis hired Julie Trujillo instead. *Id*. at 9.

      2.    Plaintiff continued to seek employment at the facility. In 2017, Genesis hired her as a part-time after-hours receptionist. Ms. Trujillo held a supervisory position. *Id*. at 7–9. Plaintiff denies that Ms. Trujillo was her direct supervisor during the time period of July 6, 2017 to late

August 2017. ECF 81 at ¶ 7. She refers to her job offer letter that informed her to report to an administrator, Myra Hampton. ECF 60-3. When Ms. Hampton left Defendant's employment, Ms. Trujillo resumed as Plaintiff's direct supervisor. ECF 81 at ¶ 7.

3.      There were times when Ms. Trujillo was present during Plaintiff's work hours. ECF 81 at ¶ 52. However, as a general matter, Ms. Trujillo's shift ended when Plaintiff's evening shift started, and Ms. Trujillo did not work weekends. ECF 60-1 at 17, 20; ECF 60-2 at ¶ 19.

4.      Defendant assumed operations at University Heights in July 2017. As part of its takeover, Defendant retained existing employees including Plaintiff and Ms. Trujillo. ECF 60-1 at 11–12. On July 6, 2017, Defendant offered Plaintiff her same position with an anticipated start date of July 10, 2017. *Id*. at 13; ECF 60-3.

5.      Plaintiff experienced a workplace injury event on August 4, 2017. She tripped on some cords that were around a desk and fell onto carpeted floor. ECF 60-1 at 14–15.

6.      At some point, Defendant reported the injury to its worker's compensation insurer. *Id*. at 16.

7.      On August 25, 2017, Plaintiff began receiving medical treatment at Concentra Medical Centers through the worker's compensation insurer. ECF 60-8 at ¶ 6; ECF 60-12. Jordan Maas, PA-C diagnosed sacroiliitis and sacroiliac joint sprain (or in plain language, a hip sprain). Ms. Maas returned Plaintiff to work the next day for the full shift but limited her to standing occasionally; lifting, pushing, or pulling up to five pounds occasionally; and an option to change positions periodically. The restrictions were in effect until the next appointment scheduled of August 30, 2017. ECF 60-12. Plaintiff did not give Defendant the treatment note containing the clinic's restrictions at this time.

8.      On the same day of the clinic appointment, Plaintiff called Ms. Trujillo to say she would be coming into work late, at 5:00 pm, rather than the 1:00 pm scheduled start time. ECF 60-

13. However, she did not show up for work at all on August 25 or the next day. Ms. Trujillo issued a Corrective Action Form for the two "no call/no show" incidents. *Id.* Plaintiff explains that Nicole Kent, a Human Resources Manager, instructed her not to return to work until she had received medical clearance. ECF 81 at ¶ 20.

9.      Plaintiff returned to the clinic on September 1, 2017. The limitation to lifting, pushing, and pulling up to five pounds remained the same. However, Ms. Maas now restricted Plaintiff to sitting ninety-five percent of the time. ECF 60-15. Again, Plaintiff did not submit the clinic's restrictions in written form to Defendant. Ms. Maas repeated those same restrictions on September 7, 2017. Ms. Maas anticipated that maximum medical improvement would be reached on September 15, 2017. ECF 60-16. Plaintiff first informed Defendant of the clinic's specific work restrictions on September 6, 2017. ECF 60-14.

10.     On September 7, 2017, Ms. Trujillo emailed Ms. Bower, a Human Resources Manager, and Ms. Kent. Ms. Trujillo wrote that earlier Plaintiff had not gone to her follow-up clinic appointment, and she was refusing to work in the dining room because of her injury.

11.     Ms. Bower wrote a note memorializing a meeting on September 8, 2017 with Plaintiff, Ms. Kent, and Ms. Trujillo. Plaintiff had asked Ms. Bower to participate "because she did not feel heard or is attacked when she has tried to have conversations previously." ECF 60-10. Plaintiff agrees that the meeting occurred. She says Ms. Bower's notes prove that she "initiated the meeting to address [her] complaints of unfair and illegal employment practices, specifically, that [she] was being forced to perform cafeteria duties without accommodation, that was never part of [her] job, to begin with." ECF 81 at ¶ 24.

12.     One topic at the meeting concerned dining room duty which Plaintiff denied was a permanent part of her job. Ms. Trujillo responded that it always was part of the after-hours receptionist position. ECF 60-2 at ¶ 12; ECF 60-5. Plaintiff "felt she was too old and it was beneath

3

her to do those duties as she is well educated and would have never taken this kind of position with this kind of work involved." She threatened to quit and remove her nephew rather than continue to do them. ECF 60-10.

13.     Another meeting topic was her work restrictions. Earlier that day, Defendant had contacted the clinic, and it was Defendant's understanding that Plaintiff remained able to take meal orders. ECF 60-8 at ¶¶ 7–9; ECF 60-14. Ms. Bower explained to Plaintiff that Defendant has "the authority to clarify those restrictions specific to the job duties [that Defendant is asking her] to perform." Ms. Bower stated that both she and Ms. Trujillo had contacted the clinic to inquire about specific details regarding Plaintiff's ability to help with meal service. ECF 60-10. On September 8, 2017, Jim Keller, PA-C amended the prior September 7, 2017 treatment note to add that Plaintiff "may take meal orders for residents & walk up to an hour total in completing these tasks." ECF 60-16.

14.     At a September 13, 2017 clinic appointment, Plaintiff complained of right hip pain "exacerbated by having to take lunch orders/serving elderly residents in long-term care facility rather than performing her seated receptionist work." Given "her increased [right] hip pain," Mr. Keller changed the work restrictions. ECF 60-18. He limited Plaintiff to "seated receptionist duties only" and "no taking food orders from, or serving, residents." ECF 60-17.

15.     On Monday, September 25, 2017, Ms. Trujillo emailed Plaintiff about not adhering to the two previous Fridays' scheduled work hours. Ms. Trujillo reminded her that to "call off without prior approval . . . is considered an unexcused absence." ECF 60-19.

16.     Plaintiff went to the clinic on September 25, 2017. She expressed to Ms. Maas "frustration with being asked to do duties that are outside of her job description, namely dining room duties." She also complained about Defendant's report that a male doctor had amended the restrictions to require her to work dining room duties. Ms. Maas asked Mr. Keller, the only

provider who had seen Plaintiff other than herself, about it. Mr. Keller denied making "such a statement, although he did amend her restrictions to more specifically restrict her duties in the dining room. ECF 60-21 at 2. Ms. Maas modified the work restriction to make it more general and "to remove specific restriction of work duties." *Id*. at 1. Ms. Maas continued the restriction to sitting ninety-five percent of the time with no squatting or kneeling, and she imposed the general restriction of no lifting/pushing/pulling. As for weight-bearing ability, she permitted lifting, pushing, and pulling up to *zero* pounds on an occasional basis. ECF 60-20.

17.     Ms. Trujillo emailed Ms. Bower and Ms. Kent about the new work restrictions. She initially proposed letting Plaintiff take meal orders from a chair, but she was concerned about whether the zero-pound weight restriction would permit any work activity at all, such as "answering the phone." Ms. Bower responded that Plaintiff should not come to work until the clinic could be reached for clarification. ECF 60-9.

18.     On September 28, 2017, Ms. Maas amended the work restriction by reinstating the five-pound weight limit. ECF 60-21 at 2. Plaintiff describes the zero-pound weight restriction as an inadvertent typographical error. ECF 81 at ¶¶ 36, 37, 47.

19.     Susan Coulter, Vice President of Human Resources, believed that Plaintiff's dining hall work duties were compatible with the work restrictions. For example, a meal tray weighed less than five pounds. ECF 60-7 at ¶¶ 7–8. A receptionist was not expected "to feed residents, adjust, transfer or lift residents, or perform any strenuous activity." ECF 60-6 at ¶ 5.

20.     The parties agree that a meeting took place on October 3, 2017 with Plaintiff about her dining hall duty, during which she became upset. ECF 60 at ¶¶ 42–43; ECF 81 at ¶ 48. Both parties agree that Plaintiff ended the meeting by physically leaving the workplace. ECF 60 at ¶ 48; ECF 81 at ¶ 48. Plaintiff does not dispute answering Ms. Trujillo's question whether she was

quitting by stating, "take it up with corporate." ECF 60 at ¶ 48; ECF 81 at ¶ 49; ECF 81-5 at 12. Plaintiff never returned to the workplace.

21.     On October 4, 2017, Plaintiff emailed Jay Moskowitz, Defendant's CEO, about "illegal and unfair employment practices; such as harassment, retaliation, and intimidation." She attributed the retaliatory actions to her complaints "about payroll issues . . . and my work-related injury," with the most recent instance of retaliation occurring "(yesterday) October 3rd." She stated that she "can no longer work in a hostile work environment." ECF 60-23.

22.     On October 18, 2017, Ms. Coulter offered Plaintiff a receptionist position at a facility in Wheat Ridge. Plaintiff did not accept it. ECF 60-7 at ¶¶ 10–11; ECF 81-4 at 4.

## II.    Disputed Facts

The parties disagree on certain facts which the Court references below to the extent they lend context to Plaintiff's claims.

1.     Defendant asserts that Plaintiff's principal job duties and responsibilities included assisting dining room staff by taking food orders and passing out food trays for the twenty residents for thirty minutes per shift (ECF 60-2 at ¶ 4), the same as when she had worked for Genesis (ECF 60-2 at ¶ 12; ECF 60-8 at ¶ 3; ECF 60-10 at 1; ECF 60-11). Several employees state that assisting in the dining room was one of Plaintiff's job duties. ECF 60-2 at ¶ 3; ECF 60-5; ECF 60-6 at ¶ 3; ECF 60-7 at ¶ 4; ECF 60-8 at ¶ 3. Defendant furthers that every receptionist who worked evenings and weekends was expected to perform dining room duties. ECF 60-6 at ¶¶ 3–8; ECF 60-8 at ¶¶ 3–4. This is because the after-hours receptionist had a fair amount of downtime. ECF 60-2 at ¶ 5; ECF 60-6 at ¶ 6. Plaintiff does not dispute that there was some sort of expectation to help in the dining room and that at times, she (and others) actually did so. For example, she submits a Meal Duty Schedule that included various employees and "reception." ECF 81-1 at 17. Instead, she stresses that it was not stated in writing at the time of Defendant's July 2017 job offer and that the

requirement was just temporary. ECF 81 at ¶¶ 8, 29; ECF 81-5 at 7. Plaintiff also denies being told that the job entailed cafeteria or dining room duties when she applied for the job. ECF 81-5 at 6–7.

2.      Plaintiff submits into the record a handwritten "Employee/Supervisor Meeting" note that purports to memorialize a meeting between her and Ms. Hampton on July 28, 2017 (shortly after Defendant became her employer). ECF 81-1 at 9. She relies on it as evidence that dining hall duty was temporary. However, Ms. Hampton denies knowledge of the note or writing her initials on it. ECF 84-1. She says the note and her initials appear to have "been forged." *Id.* at ¶ 6.

3.      There is a dispute in the record about when Plaintiff reported her August 4, 2017 workplace injury to Defendant. Plaintiff says that she first reported it three days later when she spoke with Ms. Hampton. ECF 60-1 at 15. However, Ms. Hampton wrote a meeting note on August 11, 2017 in which she states that Plaintiff should have reported the fall immediately. ECF 84-1 at 4. Plaintiff also submits a Timekeeping Exception Form dated August 5, 2017 in which she reports not clocking out for lunch on August 4 and August 5, 2017 (ECF 81-3 at 15), but the form makes no mention of the fall incident.

4.      Ms. Coulter recalls that it was on September 6, 2017 when Plaintiff complained to her "about her dining room responsibilities, specifically that she felt dining room duties were not part of her job." ECF 60-7 at ¶ 3. Plaintiff states that she did not speak with Ms. Coulter until October 4, 2017. ECF 81 at ¶ 23.

5.      The parties dispute the purpose of Defendant's communication with the clinic on September 8, 2017. Plaintiff claims that Defendant improperly requested the clinic to change her work restrictions. ECF 81 at ¶ 30. Ms. Kent attests that she contacted the clinic only for clarification. ECF 60-8 at ¶¶ 7–10.

### III.    Claims for Relief

In her Amended Complaint (ECF 6), Plaintiff sues Defendant under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq*., ("ADA") for employment discrimination on the basis of disability, failure to accommodate, and retaliation. She includes a Title VII-based retaliation claim.

### **LEGAL STANDARDS**

### I.    Fed. R. Civ. P. 56(c)

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). "Summary judgment is not a disfavored procedural shortcut. Instead, it is an important procedure designed to secure the just, speedy and inexpensive determination of every action." *Evans v. Cawthorn*, No. 16-3095-DDC-ADM, 2019 WL 5787952, at *3 (D. Kan. Sept. 6, 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the lawsuit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex*, 477 U.S. at 327. "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). In other words, the opposing party must do more than make a conclusory denial of an asserted material fact but explain the reason for the denial with an accompanying specific reference to the evidentiary record. *Am. Auto. Ins. Co. v. Marlow*, 666 F. Supp. 2d 1209, 1212 (D. Colo. 2009); Section III(F) of the undersigned's Practice Standards---Civil Actions. If the parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, the court should not adopt that version. *Pierson v. Bassett*, 534 Fed.Appx. 768, 771 (10th Cir. 2013).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

### I.     ADA Disability Discrimination

A covered employer may not "discriminate against a qualified individual on the basis of disability in regard to [employment matters]." 42 U.S.C. § 12112(a). To establish a prima facie case of disability discrimination, Plaintiff must prove she is (1) disabled, (2) qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) suffered discrimination because of her disability. *Dennis v. Fitzsimmons*, — F. App'x —, 2021 WL 868490, at *3 (10th Cir. 2021).

#### A.     Disability

To bring an ADA lawsuit, Plaintiff must establish that she is disabled within the meaning of the statute. As applicable here, ADA defines "disability" to mean "a physical . . . impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). A physical impairment can be any physiological disorder or condition that affects a musculoskeletal body system. 20 C.F.R. § 1630.2(h)(1). Major life activities include such tasks as walking, standing, sitting, lifting, or working. 20 C.F.R. § 1630.2(i)(1)(i). "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 20 C.F.R. § 1630.2(j)(1)(ii). "[T]he threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 20 C.F.R. § 1630.2(j)(1)(iii). In other words, the standard for ADA disability is not demanding, and it is to be construed broadly. 42 U.S.C. § 12102(4); *Bowers v. Netsmart Techs., Inc.*, No. 19-cv-2585-JAR, 2021 WL 2104985, at *7–8 (D. Kan. May 25, 2021) (discussing ADA's "disability" definition). The Plaintiff must articulate with precision both her impairment and the major life activity it substantially limits. *Kulasa v. Wyndham Vacation Rentals N. Am., LLC*, No. 19-cv-

00561-NRN, 2020 WL 5982884, at *4 (D. Colo. Oct. 8, 2020) (citing *Johnson v. Weld Cty.*, 594 F.3d 1202 (10th Cir. 2010)).

Plaintiff submits a photograph of power cords along a desk (ECF 81-1 at 18) which she says caught the heal of her shoe causing her to fall onto the carpeted floor (ECF 60-1 at 15; ECF 81-1 at 23; ECF 81-5 at 8). She did not take herself for medical care at the time of the fall. The first medical appointment took place seven days later through the worker's compensation insurer. A physician's assistant, Ms. Maas, diagnosed a hip sprain condition, and during the remaining period of Plaintiff's employment, Ms. Maas, along with a second physician's assistant, Mr. Keller, provided care. The clinic's treatment notes show no radiographs taken during the time of her employment. Treatment appears to have been based primarily on Plaintiff's subjective pain complaints, even if disproportionate to the condition's objective state. ECF 60-2. Pain relief was provided through conservative treatment measures such as aspirin and ibuprofen as well as physical therapy. ECF 81-3 at 3.

Defendant argues that Plaintiff's condition is temporary in nature and thus does not qualify as a disability for ADA purposes. It cites 42 U.S.C. § 12102(3)(B), which excludes from ADA coverage "impairments that are transitory or minor," but that provision applies only to the situation in which an employer regards an employee as having an impairment. 42 U.S.C. § 12102(1)(C). It does not apply to the actual disability context that this case presents. Defendant also cites *Toyota Motor Mfg. Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) and *Huckans v. U.S. Postal Serv.*, 201 F.3d 448 (10th Cir. 1999) for the proposition that an ADA disability may not be a temporary condition. However, Defendant does not reconcile those opinions with later amendments to the statute. *See* ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008). The ADAAA amendments broadened coverage by making it easier to establish a disability. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1303, n.1 (10th Cir. 2017); *Bowers*, 2021 WL 2104985

at *7. On the basis of the present record and legal arguments, Defendant does not show how summary judgment may be entered against Plaintiff on the question of whether she has a covered "disability."

The record shows that Plaintiff's treating providers diagnosed a medical condition and imposed activity restrictions as a means to reduce her pain complaints. Plaintiff alleges that the condition precludes her from working in the dining hall. The Colorado Department of Labor and Employment determined that she "separated from this employment because [she was] physically unable to perform the work." ECF 81-4 at 7. For purposes of the present analysis, the Court assumes that Plaintiff meets the first prima facie element of her ADA-based discrimination and failure-to-accommodate claims.

### B.        Ability to Perform Her Job's Essential Functions

Plaintiff does not allege, nor does the record otherwise suggest, that her hip sprain condition limited her ability to perform any of her receptionist duties. Instead, the focus of her grievance concerns dining hall duty. Plaintiff identifies no particular task or aspect of that work that her hip prevented her from doing. Rather, she asserts the complete inability to do them generally. If dining hall duty is an essential function of her job and she is wholly unable to do it, then she cannot establish the second prima facie element.

Title 29 C.F.R. § 1630.2(n) defines what constitutes a job's "essential functions." *Guffey v. McClain*, No. 19-cv-0328-CVE-JFJ, 2020 WL 7348009, at *4 (N.D. Okla. Dec. 14, 2020). They are "the fundamental job duties of the employment position the individual with a disability holds or desires." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) (quoting 29 C.F.R. § 1630.2(n)(1)). A function is essential if the job exists for that reason or there is a limited number of employees available to perform it. 29 C.F.R. § 1630.2(n)(2). Evidence relevant to whether a particular function is essential includes the amount of time spent on the job performing

it, the consequences of not requiring the position holder to do it, and the work experience of past and present holders of the position. 29 C.F.R. § 1630.2(n)(3). "The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

Key to the determination is the employer's judgment about what functions are essential, 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3), to which courts give considerable weight, *Lincoln v. BNSF Ry. Co*., 900 F.3d 1166, 1192 (10th Cir. 2018). It is the employer's role to describe the job and the functions required to perform it, and the courts will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity. Deference is not limitless, but Plaintiff bears the burden to dispute that evidence or otherwise show how a function is nonessential. *Id.*

Dining hall duty may not be a standard aspect of a receptionist's job, generally speaking, but Defendant explains why it was at the facility where Plaintiff worked. First, the evening and weekend receptionists often had downtime because they worked outside normal business hours. ECF 60-2 at ¶ 5; ECF 60-6 at ¶ 6. Second, the dining hall was short-staffed. ECF 81 at 1, 20; ECF 81-5 at 11. Defendant also asked other employees to help out, and dining hall assistance was limited to the relatively simpler and easier tasks. Plaintiff does not dispute that dining hall duty at least was an aspect of working at the facility at that time. ECF 60-1 at 11, 17–18; ECF 81-5 at 7, 11. She told the clinic that her job title was "Receptionist/Cafeteria Aid." ECF 81-1 at 23.

Plaintiff submits an affidavit from a resident who says he only saw Plaintiff working in the dining hall. ECF 81-3 at ¶ 3. However, another receptionist attests that she (and others) performed such duties. ECF 60-6 at ¶ 7. Plaintiff herself testified that others worked there. ECF 60-1 at 11, 18. Nor does the resident's affidavit account for the work schedule that shows how cafeteria duty was shared among a range of employees. ECF 81-1 at 17.

Plaintiff emphasizes how Defendant described the job in writing. Written job descriptions prepared before advertising or interviewing job applicants are relevant. 29 C.F.R. § 1630.2(n)(3). The "receptionist" job description that she submits makes no express mention of dining hall-related tasks. ECF 81-1 at 3–7. However, the description does add that a receptionist "performs other duties as requested." *Id*. at 3. Indeed, Ms. Trujillo invoked that very provision in a discussion with Plaintiff. ECF 6-22. Plaintiff cites no legal authority that restricts an employer to ask an employee to perform only those tasks as defined in writing at the time of hire. Even if Plaintiff did not realize that the job entailed cafeteria duty when she re-applied for the position in July 2017 (ECF 60-1 at 10; ECF 81-5 at 6-7), that does not mean Defendant did not expect it. If she did not want to do cafeteria work, which was her preference (ECF 81-3 at 8, 9; ECF 81-4 at 4), she simply could have quit.

Instead, her grievance concerns the requirement to do it after she was injured and after additional cafeteria staff were hired. In other words, she claims the requirement as a form of retaliation. Plaintiff also complains that on September 7, 2017, Defendant handed her a new written job description that added the duty to "assist in the dining room during meals [including] taking orders, passing trays, pouring drinks, etc." ECF 60-4. However, neither argument contradicts that before her injury, Defendant genuinely expected after-hours receptionists (and others) to help out in the dining hall.

The record evidence shows that dining room coverage was an important aspect of the after-hours receptionist job, even if only temporarily. Plaintiff does not demonstrate a genuine dispute over whether that additional duty was an essential function of her job, and the Court enters summary judgment in Defendant's favor on that point. If Plaintiff is contending that her hip injury left her wholly unable to work in the dining hall, then she does not establish the second element of the claim.

### C.  Adverse Employment Action

Plaintiff takes two contrary positions on whether she could perform dining hall work. First, as discussed above, she denies *any* ability to do those tasks after her injury. However, she also asserts that she "could have performed both [the receptionist and cafeteria] jobs simultaneously, with a reasonable accommodation." ECF 81-5 at 14. To the extent Plaintiff still could perform that aspect of the job, the Court proceeds to consider the third element and whether Defendant discriminated against her on the basis of her right hip sprain.

Implicit in the discrimination element is the occurrence of an adverse employment action. *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 794 (10th Cir. 2020); *Kulasa*, 2020 WL 5982884 at *4 (citing *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)). It is the same definition used for Equal Protection and Title VII claims. *Gerald v. Locksley*, 785 F. Supp. 2d 1074, 1107 (D.N.M. 2011) (citing *McCrary v. Aurora Public Sch.*, 57 Fed.Appx. 362, 373 (10th Cir. 2003)). The term means acts that cause a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a significant change in benefits. However, it is not necessarily limited to that list. The Tenth Circuit construes the term broadly and considers the issue on a case-by-case basis. *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011). The term is not limited to actions that are tangible in nature or result in monetary loss. *Brown v. Colo. Jud. Branch*, No. 19-cv-03362-MEH, 2020 WL 2848142, at *9 (D. Colo. June 2, 2020) (citing case law).

### 1.  Voluntary Termination of Employment

An adverse employment action does not occur if an employee voluntarily quits her employment. *Bowers*, 2021 WL 2104985 at *9 (citing *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008)). Whether a plaintiff "resigned or was discharged is judged by a reasonably-prudent-employee standard." *Id.* at *10. Defendant contends the evidence shows that

Plaintiff quit. Several witnesses say that during the October 3, 2017 meeting, Plaintiff abruptly left the workplace in a way that appeared as if she was quitting. ECF 60-2 at ¶¶ 16–18; ECF 60-22; ECF 81-3 at 9.  Plaintiff does not deny that she walked off the job (ECF 81-5 at 12), but she does deny telling Ms. Trujillo that she was quitting (ECF 81-3 at 19, ECF 81-5 at 12), although she does not deny telling her to "take it up with corporate." Plaintiff alleges no conduct by Defendant up to that point that reasonably would have caused her to believe that she had been fired. *Compare Bowers*, 2021 WL 2104985 at *10 (finding that the circumstances reasonably could support the plaintiff's perception of being fired) *with Fischer*, 525 F.3d at 979–80 (finding that the employer's actions would not have logically caused a prudent person to believe his employment had been terminated).

That next day, on October 4, she wrote a letter to the Defendant's owner stating that she "can no longer work in a hostile work environment." ECF 60-23. On that same day, Defendant filled out a form indicating termination because of job abandonment (ECF 81-4 at 5) based on Plaintiff's act of "walk[ing] off the job during the middle of her shift, refusing to perform work in the dining room" (ECF 60-7 at ¶ 9-10).  It is true that on later unemployment forms Defendant checked "Terminated" as the reason for the "interruption of employment," (ECF 81-4 at 10, 14) but that designation is accurate if Defendant believed that Plaintiff had walked off the job.

Plaintiff denies that she voluntarily resigned. She says that on October 4, she "made it perfectly clear" to Ms. Coulter that she "had not resigned" but rather "was requesting an investigation." ECF 81-5 at 12. However, she cites no evidence that might corroborate the otherwise conclusory denial that she acted without an intention to quit. She argues that Defendant has no written policy that defines "job abandonment." ECF 81-4 at 2; ECF 81-5 at 12. However, the lack of an official job abandonment policy is irrelevant to the question of whether she quit or was fired. She argues that the Department of Labor and Employment defines job abandonment as

not reporting to work for three consecutive days, but she never attempted to return to the workplace at all. Her letter of October 4, 2017 suggested no intent to remain at her receptionist job, and later that month, she denied a receptionist job offer at another facility (ECF 60-7 at ¶ 11; ECF 81-4 at 4).

Plaintiff contends that Defendant has not given a consistent answer for why her employment ended. ECF 81 at 20; ECF 81-5 at 13. Plaintiff provides a Colorado Department of Labor and Employment "Separation-Issue Checklist" in which items "that were determining factors in making decisions under . . . the Colorado Employment Security Act" were checked. Under the heading of "Full Award," the item "Physically or mentally unable or unqualified to do the work" was checked, and under the heading of "Disqualification," the item "Other reasons including tardiness, absenteeism, sleeping or loafing on the job; or failure to meet established or defined standards" was checked. ECF 81-4 at 8. The greater context of this one page is unclear. Plaintiff cites a page from another document in which the "Laid Off/Lack of Work" is given as the answer to "What is the reason for the claimant's separation from employment?" ECF 81-4 at 9. However, that question concerned a job which ended on July 9, 2017, presumably in reference to when Genesis stopped being her employer and before Defendant re-hired her. Plaintiff cites to another page which states that "the claimant was laid off due to a permanent lack of work," ECF 81-4 at 11, but it lacks any context. Consequently, Plaintiff's reliance on those documents does not suggest the kind of inconsistency that would create a material fact dispute whether Plaintiff quit, or was fired, from her job.

The record does not support the inference that Plaintiff's employment ended because Defendant *fired* her before she had left (even if it later may have terminated her for job abandonment). Indeed, Plaintiff's argument that she was constructively discharged implies that

she decided to leave. Plaintiff does not show an adverse employment action in the form of involuntary termination by an affirmative act of Defendant.

### 2.    Constructive Discharge

Plaintiff argues that she felt compelled to walk off the job and resign because of a hostile environment that Defendant's insistence on dining hall duty had created. ECF 60-23; ECF 81 at 11, 20. In other words, Plaintiff claims constructive discharge, which would count as an adverse employment action, *Fischer*, 525 F.3d at 979.

"A constructive discharge occurs when an employer unlawfully creates 'working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign.'" *Martin v. Sears, Roebuck & Co*., No. 08-cv-01998-MSK-KMT, 2009 WL 4730466, at *11 (D. Colo. Dec. 7, 2009) (citing *Strickland v. United Parcel Serv., Inc*., 555 F.3d 1224, 1228 (10th Cir. 2009)). "The standard is an objective one, and thus, the subjective perceptions of the employee and employer are irrelevant." *Id*. The employee's subjective perception of a stressful workplace is not a relevant factor. *Id*. (citing *Potts v. Davis Cnty*., 551 F.3d 1188, 1195 (10th Cir. 2009)). Instead, the dispositive question is whether a reasonable person in Plaintiff's position would have believed herself to have no other choice but to quit, *id*., under the totality of the circumstances, *Fischer*, 525 F.3d at 980. "A protest resignation, without more, does not establish constructive discharge." *Id*. at 982. "A plaintiff's burden in a constructive discharge case is 'substantial.'" *EEOC v. The Spud Seller, Inc*., 899 F. Supp. 2d 1081, 1093 (D. Colo. 2012) (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 805 (10th Cir. 2007)).

There is no doubt that Plaintiff was frustrated with the situation. As she describes it, Defendant was requiring her to work in the dining hall even though it was not part of her receptionist job and incompatible with her medical limitations. However, the overall circumstances do not indicate the degree of severity required to meet the legal definition in an objective sense.

Plaintiff was in the work environment for a relatively short period of time. She had the job for seven months total (from when she had begun working for Genesis) or for nearly three months with Defendant. Because she worked after regular business hours, she had relatively infrequent direct contact with her supervisor, Ms. Trujillo. She was in direct communication with Defendant about the dining hall work duty requirement and voiced her objection to it. Indeed, it was at a meeting on the issue when she decided to leave. She complains about Defendant's insistence to help in the dining hall, but she alleges no actions by Defendant that foreclosed all grievance options. The case does not present the kind of aggravated harassment that *Fischer* requires. 525 F.3d at 981-82.

Nor does this case present the situation in *Martin*. The plaintiff in that case perceived her employer's investigation of her sexual harassment complaint to be deficient and biased. The investigation resulted in *her* being subject of a disciplinary action, and the alleged harasser remained her supervisor. 2009 WL 4730466 at *10. Plaintiff's situation is more similar to *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998) where the employee chose early retirement rather than accept a transfer or await an opening for a different job.

### 3.      Retaliation and Failure to Accommodate

Plaintiff alleges adverse employment actions that preceded the cessation of her employment. She contends that Defendant took actions in retaliation for her requests not to work in the dining hall and refused to accommodate her medical restrictions. The Court considers those arguments separately below.

### 4.      Creation of a New, Written Job Description

Plaintiff alleges that on September 7, 2017, Defendant gave her a newly created, written description of her job duties. ECF 81-5 at 11. It included "[assistance] in the dining room during meals [including] taking orders, passing trays, pouring drinks, etc." as one of the receptionist

position's responsibilities, and defined the job's physical requirements as the ability "to push, move, and/or lift a minimum of 5 pounds." ECF 60-4. Plaintiff alleges that the creation of this written job description was done as a retaliatory act and required her to perform work beyond her medical-related work restrictions. There was no written job description before her injury date, she emphasizes, and no other employee received one.

Plaintiff cites no legal authority that the mere issuance of a job description is an adverse employment action. The Plaintiff points to how it was issued contemporaneously with the dispute over whether she was able to work in the dining hall. However, that is not the full circumstance. It also was issued after a dispute arose over whether dining hall duty was even part of the receptionist job. Defendant put in writing a duty what it already considered to be part of the job (and which Plaintiff already was doing to some extent). In that sense, the written job description added nothing new other than perhaps to make the requirement permanent as opposed to temporary.

Second, the written job description is otherwise irrelevant to the discrimination and failure-to-accommodate claims. However it defined the job's general requirements, the lawsuit concerns how Plaintiff's injury limited her ability to do them and Defendant's response to that impairment.

### D.     Summation

The Court assumes for present purposes that Plaintiff does plead the existence of a disabling medical condition even if temporary in nature. She leaves unclear whether she actually can perform the dining hall tasks that Defendant asked her to do. If her injury leaves her wholly unable to perform them, then she does not state the second element. If she remains able to do them so long as reasonable accommodation is provided, then the analysis progresses to the third element. It is with respect to that third element where the ADA discrimination claim fails. A reasonable factfinder could not find on this record that she suffered any adverse employment action as the law

defines that term. Without an adverse employment action, there is no need to consider whether a causal relationship exists between one and her disability.

Because Plaintiff does not establish a prima facie case, the Court grants summary judgment on her ADA disability discrimination claim.

## II.   Failure to Accommodate

The term "reasonable accommodation" means "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" such as through "job restructuring" or "acquisition or modification of equipment or devices." 42 U.S.C. § 12111(9). It means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position . . . is customarily performed, that enable [a qualified disabled employee] to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). An employer is required to provide reasonable accommodation, 29 C.F.R. § 1630.2(o)(4), and the failure to do so is a form of unlawful ADA discrimination, 42 U.S.C. § 12112(b)(5)(A).

The failure-to-accommodate claim requires Plaintiff to show (1) she is disabled, (2) is otherwise qualified, (3) requested a plausibly reasonable accommodation, and (4) Defendant refused to accommodate her disability. *Bowers*, 2021 WL 2104985 at *5 (citing *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020)). Neither adverse employment action nor discriminatory intent is required. Rather, the cause of action concerns an omission: an employer's failure to meet an affirmative obligation to take reasonable steps to accommodate an employee. *Exby-Stolley*, 979 F.3d at 788, 794. For purposes of this ruling, the Court assumes that Plaintiff can demonstrate the first two elements of (1) a disability (her right hip sprain and its resulting pain-related impairments) and (2) qualification to do the part-time after-hours receptionist job (specifically, dining hall duty) with the benefit of reasonable accommodation.

### A.    Whether Plaintiff Made a Request

Defendant argues that Plaintiff did not request an *accommodation* to permit her to continue helping out in the dining hall. Rather, she sought to be excused from it altogether. "[A]n employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Punt v. Kelly Servs*., 862 F.3d 1040, 1051 (10th Cir. 2017); *Kulasa*, 2020 WL 5982884 at *5 (holding that the plaintiff's request not to work the front desk, which was part of his job, was unreasonable). The record is clear that Plaintiff preferred not to work in the dining hall. The evidence reasonably could be construed that she felt wholly unable to perform any those duties. However, the record also reasonably could be construed that Plaintiff sought accommodation within the parameters of the clinic's work restrictions. For present purposes, the Court assumes that Plaintiff can show that she requested accommodation in a way that satisfies this element.

### B.    Whether Defendant Refused Reasonable Accommodation

The governing regulations envision that an employee's accommodation request will trigger an interactive, collaborative process with the employer. *Guffey*, 2020 WL 7348009 at *5, n.3; 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [disabled employee]"). Plaintiff alleges that Defendant did not attempt such a process to identify what accommodation could be made, but the record plainly contradicts that allegation. To the contrary, there was much discussion of the subject. Indeed, it was the topic of the parties' most recent meeting (when Plaintiff physically left the workplace presumably, as her supervisor perceived it, to walk off the job and quit). The evidence does not show a failure to engage in the process.

Rather, the evidence shows that Defendant tried to ascertain Plaintiff's medical-related restrictions. The injury occurred on August 4, 2017, but she did not seek treatment until August

25, 2017. Plaintiff accuses Defendant of taking no action on her reported injury during the meantime. However, Plaintiff cites to no legal authority that required Defendant to obtain medical care for her. The evidentiary record contradicts her assertion that Defendant failed to act. On August 11, 2017, Ms. Hampton wrote a note to memorialize telling Plaintiff that "she should have reported [the fall event] immediately." ECF 81-1 at 10. That is consistent with the employee manual which requires employees to report any on-the-job injury, no matter how minor, immediately to their supervisor or the on-duty manager. *Id*. at 20. On September 7, 2017, Ms. Trujillo emailed Ms. Bower and Ms. Kent expressing frustration at trying to obtain information from Plaintiff regarding medical-related work restrictions. ECF 60-14. At a meeting on September 8, 2017, Ms. Bower addressed Plaintiff's complaint about receiving wrong instructions on how to report a worker's compensation claim. Ms. Kent apologized for wrongly telling Plaintiff that she had seven days (as opposed to forty-eight hours) to report the claim. ECF 81-3 at 7.

Rather than ignore the clinic's work restrictions, Defendant contacted the clinic to seek clarification. On September 8, 2017, Ms. Bower emailed Ms. Trujillo and Ms. Kent to say that she was "calling the physician now to get clarification about taking lunch orders." Ms. Bower asked them, "[w]hat specifically does she do for activity and length of time needed to perform this duty?" ECF 81-3 at 8. On that same day, Ms. Bower explained to Plaintiff why Defendant was contacting the clinic. ECF 60-10. On September 26, 2017, Defendant sought clarification when the clinic said Plaintiff could lift no weight at all (a change which Plaintiff concedes was a mistake). ECF 60-9.

Plaintiff says that it was improper for Defendant to contact the clinic. However, she cites no legal authority to support the proposition that an employer may not seek clarification of work-related restrictions. Plaintiff furthers that Mr. Keller should not have issued work restrictions in response to Defendant's first inquiry because he had not (yet) treated her. ECF 81 at 7. She reports that after she had complained to Mr. Keller about his involvement, which she believed to be a

medical ethics violation (*Id.*; ECF 81-5 at 10), he changed her work restrictions. Regardless of whether Mr. Keller was wrong to opine about her work ability on September 8, 2017 before examining her on September 13, 2017, Plaintiff offers no evidence that when Defendant contacted the clinic for clarification, it knowingly and purposely sought to speak to *him*. Nor does Plaintiff provide evidence that would suggest that Defendant did so with an improper motive or exercised any influence over the clinic to force a change of work restrictions. Moreover, Plaintiff raises no complaint about Mr. Keller's involvement from September 13, 2017 onward.

The next issue is whether Defendant refused *reasonable* accommodation. Defendant argues that the clinic's restrictions do not constitute a proper ADA accommodation request, but even if they do, Defendant denies asking Plaintiff to work in excess of them. Ms. Hampton's August 11, 2017 meeting note reflects no complaint by Plaintiff regarding the provision of medical care or work-related impairments. The first indication of medical advice of record is the clinic treatment note dated August 25, 2017, from her first appointment. On September 26, 2017, Ms. Trujillo asked Ms. Bowers for confirmation that the adjustments she was proposing for how Plaintiff could perform dining hall duties were consistent with the clinic's work restrictions. ECF 81-5 at 2. When the clinic advised a zero-pound weight restriction, Defendant instructed Plaintiff not to come in at all. ECF 60-9 at 2. The October 3, 2017 meeting was an attempt to fashion an accommodation based on the updated restrictions.

The evidence shows that Defendant attempted to adjust Plaintiff's dining hall job duties in a way compatible with the clinic's work restrictions. Plaintiff may disagree with whether she could perform the dining hall duties, but the record makes plain that Defendant did endeavor to fashion a reasonable accommodation. "Defendant [was] under no obligation to change the structure of its business or create a new position for Plaintiff." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1177 (10th Cir. 1999).

The record evidence does not establish and Plaintiff shows no genuine fact dispute over whether Defendant refused reasonable accommodation. The Court grants Defendant's request for summary judgment on Plaintiff's failure-to-accommodate claim.

## III.  Retaliation

Plaintiff brings a claim of unlawful retaliation under both ADA and Title VII. The ADA retaliation statute prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12202(a). Likewise, Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Given their equivalency, the prima facie elements are the same. An ADA retaliation claim requires a showing that (1) Plaintiff engaged in protected activity, (2) Defendant took action that an objectively reasonable employee would have found adverse, and (3) a causal connection exists between the protected activity and the adverse action. *Aubrey*, 975 F.3d at 1015. Those elements also define retaliation under Title VII. *Anderson*, 181 F.3d at 1178.

Protected activity can range from filing formal charges to complaining informally to supervisors, and it can include accommodation requests. *Kulasa*, 2020 WL 5982884 at *5. Plaintiff alleges that she both requested accommodation and complained about how the issue of her physical inability to perform dining hall duties was being handled. However, she did not complain during the course of her employment about being unlawfully denied reasonable accommodation. The first such complaint of record occurred on October 4, 2017 when she wrote Defendant's owner about unlawful employment practices. Through October 3, 2017, her complaints about dining hall duty instead concerned whether she could perform them. She was requesting accommodation, but she was not complaining about the refusal of accommodation.

Case 1:19-cv-02454-MEH   Document 85   Filed 06/15/21   USDC Colorado   Page 26 of 28

Nevertheless, even if the Court were to assume that Plaintiff can show "protected activity," there was no adverse action taken in response. For a retaliation claim, an action is "adverse" if it might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). It must cause a significant change in employment status. *Gutierrez v. GEO Grp., Inc*., No. 11-cv-02648-PAB, 2012 WL 2030024, at *3 (D. Colo. June 6, 2012). Whether an action is materially adverse depends upon the circumstances of the particular case, and it is judged from the perspective of a reasonable person in Plaintiff's position, considering all the circumstances. *White v. Schafer*, 738 F. Supp. 2d 1121, 1136 (D. Colo. 2010); *Martin*, 2009 WL 4730466 at *9. Mere inconvenience or alternation of job responsibilities is insufficient. *Sanchez*, 164 F.3d at 532. Neither ADA nor Title VII serves as a general civility code or makes ordinary workplace tribulations actionable. *Anderson*, 181 F.3d at 1178.

As the Court explains above, the record evidence does not show that Defendant took an adverse action against her. The dining hall assignment was not newly added nor unique to her. Defendant did not fire her either directly or constructively. Plaintiff does not establish how either contacting the clinic for work restriction clarifications or creating a new written job description constitutes an adverse employment action. Without an adverse action in the first place, there was nothing to dissuade a reasonable person from complaining about discrimination.

In addition, Plaintiff references disciplinary notices for various forms of misconduct (ECF 81-3 at 10, 12-14; ECF 60-19) that she alleges Defendant issued with retaliatory motive (ECF 81-5 at 11). However, a reprimand only is relevant if it adversely affects the terms and conditions of employment, such as by increasing the likelihood of termination, undermining the current employment position, or reducing future opportunities. *Medina v. Income Support Div*., 413 F.3d 1131, 1137 (10th Cir. 2005). Plaintiff alleges no such adverse consequences resulting from them,

just the issuance of the reprimands, themselves. Nor does Plaintiff deny the veracity of the reported infractions.

There is no evidence of an adverse employment action. That in turn renders moot the question of whether Plaintiff can demonstrate a causal relationship. Because Plaintiff submits no evidence to support a prima facie retaliation claim, the Court grants summary judgment in Defendant's favor.

## IV.   Discovery

Plaintiff argues that summary judgment may not be entered against her because she was "not afforded a reasonable opportunity to conduct a fair discovery." ECF 81 at 22. She contends that Defendant did not comply with its obligation to answer discovery requests or produce documents, "which is why [she does] not have a single document as requested." *Id.* at 23. However, Plaintiff does not identify what is missing from the evidentiary record. Nor did Plaintiff lack the opportunity to seek judicial relief for any discovery shortcoming. The Scheduling Conference was held on April 15, 2020. ECF 36. Discovery came to a close in April 2021 (ECF 73), several months *after* Defendant already had filed its summary judgment motion. During the intervening year's time, the Court held six discovery conferences including the scheduling conference and ordered Defendant to produce responsive documentation on several occasions.

Second, Plaintiff complains that Defendant did not give her a copy of the video-taped deposition that she conducted of Ms. Trujillo. As Defendant emphasizes, Plaintiff is the one who requested the deposition, but at her request, Defendant set it up as a video conference because there was no court reporter. Both Plaintiff and Defendant had equal ability to record the deposition. Defendant says its request for $250 reimbursement to provide a recording was reasonable under the circumstances.

The Court finds no discovery deficiency that would preclude the entry of summary judgment.

## **CONCLUSION**

Plaintiff contends that her workplace injury impaired her ability, either in whole or in part, to work in the dining hall. Defendant believed that with adjustments, she still could perform some of those duties within the scope of the clinic's work restrictions. At issue is whether Defendant violated the ADA in how it handled the situation. Plaintiff attacks every aspect of Defendant's actions and explanation. However, as the above description of the summary judgment standard stresses, the mere accusation of wrongdoing alone is insufficient. Even after construing it and her arguments broadly in her favor, the evidentiary record—including records that she submits and her own testimony—do not corroborate her allegations of *unlawful* conduct. Disability discrimination, failure to accommodate, and retaliation have precise legal definitions, and Plaintiff does not show on this record how Defendant's actions meet them.

Accordingly, Defendant's Motion for Summary Judgment [filed February 12, 2021; ECF 60] is **granted** as to all claims that Plaintiff raises in her Amended Complaint (ECF 6). The Clerk of Court shall close this civil action.

Dated at Denver, Colorado, this 15th day of June, 2021.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge